MOYES SELLERS & HENDRICKS
Keith L. Hendricks (AZSBN: 012750)
1850 North Central Avenue, Suite 1100
Phoenix, Arizona  85004
Telephone: (602) 604-2141
khendricks@law-msh.com
docket@law-msh.com

*Local Counsel for Mayfair Gold Corp.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mayfair Gold Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>Patrick Evans and Jane Doe Evans, husband and wife,<br><br>Defendants. | No.: CV<br><br>**COMPLAINT**<br><br>**(Demand for Jury Trial)** |

Plaintiff Mayfair Gold Corp. ("Mayfair Gold" or  the "Company") files this Complaint for damages against Defendant Patrick Evans, and alleges as follows:

### INTRODUCTION

1.      Defendant Patrick Evans served as the CEO and director of Plaintiff Mayfair Gold, an exploration-stage mining company, from 2020 until June 2024.  By April 2024, Defendant Evans knew that his tenure was about to come to an end.  That is because a major Mayfair Gold shareholder, Muddy Waters Capital LLC ("Muddy Waters"), had initiated a proxy contest, scheduled a shareholder vote for June 5, and announced that it had received majority support from the voting shareholders.

00339271

1    2.      Facing an imminent exit, Defendant Evans fraudulently embarked on a

2   scheme to obtain a termination payment for himself.  Specifically, he surreptitiously

3   amended his employment agreement with the Company and then lied about it, falsely

4   claiming that his supposedly amended agreement had been in effect before the

5   announcement of the proxy contest.  The amended employment agreement stated that

6   Defendant Evans would receive a termination payment of approximately $1.5 million

7   Canadian Dollars ("CAD") upon the occurrence of a "change in control," the definition of

8   which he unilaterally altered to include a mere change in the composition of the board.

9    3.      Defendant Evans also induced a group of other employees to enter into

10  analogous schemes, including similarly amending their employment agreements with the

11  Company.  Had Defendant Evans and all these employees received their termination

12  payments, the payments would have totaled approximately $4 million CAD, at least 40% of

13  Mayfair Gold's entire treasury at the time.  In May 2024, shareholder Muddy Waters sued in

14  a British Columbia court in to stop these payments.  All the employees—except for

15  Defendant Evans—voluntarily agreed to forego their termination payments.

16   4.      Defendant Evans, however, received his unlawful approximately $1.5 million

17  CAD termination payment, premised on his fraudulent scheme.

18  **THE PARTIES**

19   5.      Plaintiff Mayfair Gold is a business corporation organized under the laws of

20  British Columbia, Canada with its principal place of business in Matheson, Ontario, Canada.

21  Mayfair Gold is an exploration-stage company dedicated to the discovery and development

22  of gold projects in Canada.  Its principal venture is operating the Fenn-Gib Gold Project in

23  northeast Ontario.

24   6.      Defendant Patrick Evans, the former CEO and a former board member of

25  Mayfair Gold, both from 2020 to 2024, is an adult individual who resides in Scottsdale, AZ.

26

00339271

7.      Defendant Jane Doe Evans is a fictitious defendant named in the event that Defendant Patrick Evans is married. Upon information and belief, at all times material hereto Patrick Evans was acting on behalf of his marital community with Jane Doe Evans.

## JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1332.  There is complete diversity among the parties and the amount in controversy is in excess of $75,000.

9.      This Court has personal jurisdiction over Defendant Evans because he resides in Arizona.

10.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant Evans resides in this judicial district, and Defendant Evans, the only defendant, resides in Arizona.  Venue is also proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of property that is the subject of the action is situated in this district.

## FACTUAL ALLEGATIONS

### A.      The Proxy Contest Involving Mayfair Gold

11.      From approximately November 2023 through February 2024, Muddy Waters—a major Mayfair Gold shareholder—developed serious concerns about the direction of the Company and about Defendant Evans' leadership.  This was for three primary reasons:

12.      First, Muddy Waters learned in November 2023 that the Company had issued an excessive number of stock options to its incumbent officers and directors, including Defendant Evans.  This decision significantly depleted the number of options that could be issued in the future to attract and retain additional employees because the number of issuable options was subject to a cap.

00339271

13.    Second, also around November 2023, Mayfair Gold learned that Defendant Evans and other officers and directors had allowed delays to accumulate on a number of key objectives in the Company's key venture, the Fenn-Gib gold project.

14.    Third, in February 2024, the incumbent Mayfair Gold board declined to add a director seat for Henry Heeney, a co-founder of the Company and another major shareholder, who held a contractual right to be nominated to the board. Muddy Waters viewed that refusal as a disregard of shareholder interests more broadly.

15.    As a result, Muddy Waters' representative Darren McLean had a series of telephone and in-person conversations with Defendant Evans from approximately November 2023 through March 2024. These meetings, however, did not satisfy Muddy Waters that Defendant Evans and the other members of Mayfair Gold's incumbent management and board were adequately considering shareholder interests.

16.    A series of other efforts by Muddy Waters in March 2024 to amicably resolve its concerns with Mayfair Gold also failed.

17.    On March 14, 2024, Muddy Waters wrote to Mayfair seeking to have two directors (Mr. McLean and a person with technical expertise) appointed to the board. The incumbent Mayfair Gold board rejected this proposal. As a result, on March 19, 2024, Muddy Waters issued a press release announcing its intention to solicit proxies to partially reconstitute Mayfair Gold's board. A true and correct copy of this press release is attached as **Exhibit 1**.

18.    Nevertheless, Mr. McLean continued to negotiate with incumbent board chair Harry Pokrandt, including by offering to withdraw the proxy contest if Muddy Waters were given two board seats. The incumbent Mayfair Gold board rejected this proposal.

00339271

1   19.   Muddy Waters therefore proceeded with a proxy contest that successfully

2   replaced the entire Mayfair Gold board.  The key dates and events of this proxy contest

3   include:

4       a.   On March 27, 2024, Muddy Waters formally requisitioned a shareholder vote

5           to remove and replace the entire Board.  A true and correct copy of this

6           requisition is attached as **Exhibit 2**.

7       b.   On April 2, 2024, Muddy Waters announced via press release that it had

8           received support from shareholders holding a majority of voting rights to

9           reconstitute the board.  A true and correct copy of this press release is

10           attached as **Exhibit 3**.

11       c.   On April 17, 2024, Mayfair Gold set the date of the shareholder vote for June

12           5, 2024.

13       d.   At the June 5 vote, as expected, over 91% of the voting shareholders voted for

14           Muddy Waters' slate of directors (which included Mr. McLean) and against

15           the incumbent directors (which included Defendant Evans and Mr. Pokrandt).

16           On the same day, the new Board appointed Mr. McLean as Interim CEO,

17           replacing Defendant Evans.

18   **B.**   **Defendant Evans' Scheme to Secure Termination Payments For Himself**

19       **And Others**

20   20.   As the events of this proxy contest played out, it became clear to Defendant

21   Evans that he was about to lose his job as CEO and director of Mayfair Gold.  As noted

22   above, Muddy Waters announced its proxy contest on March 27 and announced on April 2

23   that it had already received support from shareholders holding a majority of voting rights.

24   21.   In response, Defendant Evans engineered a fraudulent scheme by which the

25   success of Muddy Waters' proxy contest would entitle Defendant Evans to receive a

26

00339271

1  generous termination payment from the Company of approximately $1.5 million CAD.  In

2  the weeks leading up to the June 5 shareholder vote, Defendant Evans surreptitiously

3  amended his employment agreement to alter the agreement's change-in-control provision to

4  include merely a change in the composition of the board.  To hide his tracks, he backdated

5  the agreement to read as though it were made "as of January 1, 2024," to make it seem as

6  though it were in effect prior to the announcement of the proxy contest.

7      22.    Defendant Evans was not otherwise entitled to this termination payment.  The

8  initial version of his employment agreement entitled to him to receive a termination

9  payment in the event of a "change in control" of the Company.  A true and correct copy of

10  the employment agreement between Defendant Evans and the Company dated August 12,

11  2020 is attached as **Exhibit 4**.  "Change in control" is not specifically defined in that version

12  of the agreement, although the generally accepted definition of "change in control" (or

13  "change of control") includes only a change in ownership of the Corporation (e.g., an

14  acquisition by another company), not merely a change in the composition of the board.

15      23.    Defendant Evans subsequently fraudulently orchestrated the amending of his

16  employment agreement.  On January 29, 2024, Defendant Evans entered into an amended

17  employment agreement with the Company (the "January 29 Agreement"), effective January

18  1, 2024.  A true and correct copy is attached as **Exhibit 5**.  Confirming that the existing

19  "change in control" provision referred only to a change in ownership of the corporation, and

20  not a change in the composition of the board, it defined "change in control" as follows:

21
22
23
24

> A Change in Control occurs on the sale or substantially all of the assets of the Corporation; any merger, consolidation or acquisition of the Corporation by or into another corporation, entity or Person; the acquisition by any Person or Persons acting together of sufficient voting rights to affect the control of the Corporation; or any change in ownership of fifty percent (50%) or more of the voting capital stock of the Corporation.

25
26

00339271

1    24.    On April 17, 2024, however, facing his inevitable ouster by shareholder vote,

2   Defendant Evans fraudulently created a new version of his employment agreement (the

3   "April 17 Agreement"), attached here as **Exhibit 6**.  The April 17 Agreement also purports

4   to have been made as of January 1, 2024.  The April 17 Agreement also broadens the

5   definition of "change in control" to include a mere change in the composition of the board:

6
> A Change in Control occurs on the sale or substantially all of the
7
> assets of the Corporation; any merger, consolidation or
> acquisition of the Corporation by or into another corporation,
8
> entity or Person; the acquisition by any Person or Persons acting
> together of sufficient voting rights to affect the control of the
9
> Corporation; or any change in ownership of fifty percent (50%)
> or more of the voting capital stock of the Corporation; <u>or a change</u>
10
> <u>in the composition of the Board that results in the current directors</u>
> <u>of the Board constituting less than a majority of the members of</u>
11
> <u>the Board</u> (emphasis added).

12    25.    The April 17 Agreement was fabricated by Defendant Evans:

13        a.    On April 17, 2024, Defendant Evans and Justin Byrd, the Company's

14            then-CFO, emailed the Company's then-corporate counsel at BLG, a

15            Canadian law firm, about whether Muddy Waters' proxy contest would

16            trigger the change-in-control provisions in the existing employment

17            agreements.  At approximately 2:00 PM ET that day, Mr. Byrd emailed

18            the BLG lawyers a copy of Defendant Evans' employment agreement,

19            attaching the January 29 Agreement.  This email and attachment are

20            attached here as **Exhibit 7**.

21        b.    Later that day, at approximately 6:00 PM ET, Defendant Evans emailed

22            the BLG lawyers and asked them to "ignore the employment

23            agreements sent earlier by Justin [Byrd]," because "[h]e didn't have the

24            latest versions <u>approved last January</u>" (emphasis added).  Defendant

25            Evans then attached the April 17 Agreement to his email.  This email

26            and attachment are attached here as **Exhibit 8**.

00339271

1

2

3

4

5

6

7

     c.     The metadata on the April 17 Agreement attached to Defendant Evans' email demonstrates that he created the document at approximately 3:00 PM ET on the 17th.  A screenshot of this metadata is attached as **Exhibit 9**.  Consistent with the conclusion that Defendant Evans created the April 17 Agreement that day, Mayfair Gold's subsequent investigation has not revealed any copy of the April 17 Agreement existing on Mayfair Gold's email server prior to that date.

8

9

    26.    Defendant Evans was not authorized to amend the January 29 Agreement to insert a broader definition of change-in-control.  Among other things:

10

11

12

13

14

15

     a.     In his April 17 email to the BLG lawyers, Defendant Evans claimed that the April 17 Agreement had been "approved last January."  This statement was false because the actual version of the employment agreement approved by the Company in January—the January 29 Agreement—had the narrower change-in-control definition noted above.

16

17

18

19

20

21

22

     b.     Defendant Evans later claimed that he was authorized by Mr. Pokrandt during a phone conversation on or about March 5, 2024 to amend his employment agreement.  However: (1) on information and belief, this phone conversation never occurred; and (2) Mr. Pokrandt lacked the authority (without a full vote of the Company's board or the Compensation Committee of the board) to authorize such an amendment.

23

24

25

    27.    Defendant Evans transmitted the April 17 Agreement to the BLG lawyers and passed it off as authentic in an attempt to procure a termination payment as a result of Muddy Waters' proxy contest.

26

00339271

28.     Additionally, in a further attempt to disguise his fraud, Defendant Evans deleted a large number of Company emails and files.  On March 24, 2024, in the course of the proxy contest, Muddy Waters sent BLG a preservation letter instructing Mayfair Gold's management to preserve all documents, specifically including "all documents relating to decisions or steps taken with respect to Board and management compensation."  A true and correct copy of this letter is attached as **Exhibit 10**.  In blatant disregard of his legal obligations to preserve documents—and as clear evidence of his recognition of his own culpability—Defendant Evans on June 5, 2024 (i.e., his final day as CEO and director) deleted or trashed 396 Company emails, including communications with Mr. Pokrandt and the BLG lawyers.  On the same day, Defendant Evans emailed 288 Company emails and attachments to his personal email address.

29.     On May 1, 2024, Defendant Evans purported to resign his employment, writing in a letter addressed to the board, attached as **Exhibit 11**, "[u]nder the terms of my employment agreement date [sic] January 1, 2024, I hereby give notice of termination as a result of a change of control.  My change of control payment should be made within seven days."

30.     In furtherance of Defendant Evans' fraudulent scheme, on May 6, Defendant Evans caused Mayfair Gold to enter into a purported "Settlement Agreement" with him, attached as **Exhibit 12** (as redacted and filed in the British Columbia Court, *see infra*).  Under the terms of the Settlement Agreement, Defendant Evans agreed to continue working for Mayfair Gold until the June 5 shareholder vote.  In exchange, the Company placed Defendant Evans' termination payment of $1,525,912 CAD into a Trust, with the provision that payment would be immediate and automatic to Defendant Evans in the event Muddy Waters succeeded on June 5 in reconstituting the board.

00339271

31.     Also, in furtherance of Defendant Evans' fraudulent scheme, at a May 6, 2024 meeting of the Company's board, three directors voted to ratify "the Employment Agreement made as of January 1, 2024 between the Company and Patrick Evans."  But this ratification was insufficient.  If these directors were unaware of Defendant Evans' surreptitious amending and backdating of the April 17 Agreement, then their ratification is invalid.  Alternatively, if they were aware, then their ratification is a nullity because it would have been in breach of their fiduciary duties to the Company (and render them liable as co-conspirators to Defendant Evans' fraud).

32.     On June 5, following the shareholder vote, the termination payment was disbursed to Defendant Evans from the Trust.

33.     In addition to securing a fraudulent termination payment for himself, Defendant Evans also induced several other Mayfair Gold employees to enter into similar schemes.  Like Defendant Evans, these other employees had pre-existing employment agreements that lacked a definition of "change in control" that would have provided for a termination payment in the event of a change in the composition of the board.  Defendant Evans, however: (a) fraudulently amended these other employees' employment agreements to insert a broader definition of "change in control" that would be triggered by a change in the composition of the board; and (b) induced these employees to enter into the Settlement Agreement under which they would resign and receive termination payments upon the success of Muddy Waters' proxy contest on June 5.

34.     This group of employees included Matthew Evans, who is Defendant Evans' son.  Neither this familial relationship nor even the fact of Matthew Evans' employment at Mayfair Gold was publicly known at the time because Defendant Evans concealed these facts.  During Defendant Evans' tenure as CEO, Matthew Evans held the title of VP of Corporate Affairs at Mayfair Gold; he was paid a base salary of $177,408 CAD, plus a 50%

00339271

1   annual bonus, plus stock options.  Additionally, the May 6, 2024 Settlement Agreement

2   purported to entitle Matthew Evans to a termination payment of $583,841 CAD.

3   Nevertheless, there is reason to doubt whether Matthew Evans really was a legitimate

4   employee of Mayfair Gold: Social media searches reveal that Matthew Evans appears to

5   work as a musician and artist in West Hollywood, California, which is 1,200 miles from

6   Mayfair Gold's headquarters.

7          35.     Pursuant to the Settlement Agreement, Mayfair Gold placed into the Trust an

8   amount sufficient to make the termination payments to all the employees who were parties

9   to the Agreement.  That amount equaled approximately $4 million CAD—at least 40% of

10  Mayfair Gold's entire treasury at the time—which Mayfair Gold lost access to under the

11  terms of the Settlement Agreement.  Ultimately, faced with the threat of litigation (as

12  detailed below), all employees except for Defendant Evans agreed to voluntarily forego

13  their termination payments and return those funds to Mayfair Gold.  Accordingly, the funds

14  earmarked for those payments—approximately $2.5 million CAD—were returned from the

15  trust to Mayfair Gold. Defendant Evans, however, received his termination payment and

16  remains in possession of funds—approximately $1.5 million CAD—that belong to the

17  Company.

18          **C.     Muddy Waters' Efforts To Halt The Change-in-Control Payments**

19          36.     Only on May 9—after Defendant Evans put in place his fraudulent scheme

20  unbeknownst to Muddy Waters—did the Company's prior management reveal in securities

21  filing that the Company had entered into amended employment agreements, "[e]ffective

22  January 1, 2024," with Defendant Evans and other employees.  That filing disclosed for the

23  first time that the amended agreements defined a "change in control" to include "a change in

24  the composition of the Board that results in the current directors of the Board constituting

25

26

00339271

1  less than a majority of the members of the Board."  A true and correct copy of this securities

2  filing is attached as **Exhibit 13**.

3       37.     Muddy Waters therefore immediately sought information from the Company

4  concerning this disclosure and filed complaints against the Company with Canadian

5  securities regulators.

6       38.     After delay, on May 16, the Company disclosed a copy of the "Settlement

7  Agreement."

8       39.     Soon thereafter, on May 27, 2024, Muddy Waters filed an *ex parte* petition in

9  the Supreme Court of British Columbia arguing that Mayfair Gold, under its incumbent

10  leadership, had acted in a manner oppressive to Muddy Waters' interests as shareholder.

11  The petition sought, among other forms of relief: (1) a declaration that the proxy contest did

12  not trigger the change in control provisions under the employment agreements with

13  Defendant Evans and other employees; and (2) an order directing the $4 million CAD

14  placed into trust under the Settlement Agreement to be returned to Mayfair Gold.

15       40.     Later that same day, the Court granted the Canadian equivalent of a temporary

16  restraining order in Muddy Waters' favor, ordering that the $4 million CAD placed into the

17  Trust not be disbursed or diminished for thirty days.

18       41.     Mayfair Gold, Defendant Evans, and other incumbent directors subsequently

19  filed responses arguing, among other things, that Muddy Waters' claims were improper

20  shareholder claims and could only be brought on behalf of the Company derivatively.

21       42.     Within nine days thereafter, revealing that the Settlement Agreement and

22  termination payments were fraudulently procured, all the employees who were parties to the

23  Settlement Agreement, except Defendant Evans, agreed to forego their termination

24  payments.  Accordingly, the termination payments fraudulently claimed by this group of

25

26

00339271

employees, totaling approximately $2.5 million CAD, were not paid by the Trust to the employees and the funds were returned to the Company.

43.    Unlike the employees, however, Defendant Evans refused to return his termination payment.

44.    On June 4, 2024, the Court issued an unreasoned Order setting aside its May 27 Order in favor of Muddy Waters.

45.    On June 5, Defendant Evans' resignation became effective, and, pursuant to the British Columbia Court's June 4 Order, Defendant Evans received his termination payment of approximately $1.5 million CAD.

46.    Muddy Waters discontinued the British Columbia litigation as to Defendant Evans without prejudice on November 25, 2024.

47.    Plaintiff Mayfair Gold therefore brings this action to recover the termination payment Defendant Evans wrongfully procured from the Company.  Additionally, this matter arises out of contract. Because this matter arises out of contract, Plaintiff Mayfair Gold is entitled to recover its reasonable attorneys' fees and costs in connection with this lawsuit pursuant to A.R.S. § 12-341.01.

## COUNT I
### *Fraud*

48.    Plaintiff Mayfair Gold re-alleges and incorporates herein the preceding allegations.

49.    Defendant Evans misrepresented to Mayfair Gold that he had a contractual right as of January 1, 2024 to receive a termination payment in the event of a shareholder vote that changed the composition of at least 50% of the Board of Directors.

50.    This fraud claim therefore arises out of contract, i.e., Defendant Evans' misrepresentations with respect to the January 29 Agreement or the April 17 Agreement.

00339271

51.    Those misrepresentations were false because, among other things, Defendant Evans fraudulently created an employment agreement on April 17, 2024 and fraudulently represented that he had an employment agreement with a broader definition of "change in control" than he in fact had.

52.    Defendant Evans' misrepresentations were material because Mayfair Gold would not have made the termination payment to Defendant Evans in the absence of the change in control provision that he fraudulently included in the April 17 Agreement.

53.    Defendant Evans knew that his representation was false because he modified his employment agreement in order to insert a broader definition of "change in control" into the April 17 Agreement.

54.    Defendant Evans intended that Mayfair Gold would rely upon and act upon his false representation.  He created the April 17 Agreement specifically to induce the Company to make a termination payment to him.

55.    Mayfair Gold officers, directors and counsel not acting with Defendant Evans did not know that Defendant Evans was making the foregoing misrepresentations.

56.    Mayfair Gold relied on the truth of Defendant Evans' misrepresentation in making the termination payment.

57.    It was reasonable under the circumstances for Mayfair Gold to rely on what its CEO claimed to be his true employment agreement, which purported on its face to have been signed by Defendant Evans, signed by the then-chair of the board, and made as of January 1, 2024.

58.    As a result of its reliance on Defendant Evans' misrepresentation, Plaintiff Mayfair Gold was harmed by the loss of the funds improperly paid to Defendant Evans as a termination payment.

59.    As a result, Mayfair Gold has suffered damages of at least $1,525,912 CAD.

00339271

1

## COUNT II
### *Breach of Fiduciary Duty*

2

3

60.    Plaintiff Mayfair Gold re-alleges and incorporates herein the preceding allegations.

4

5

61.    As CEO and Director of Mayfair Gold, Defendant Evans owed a fiduciary duty to Mayfair Gold during the time he held those offices.  The relationship of an officer or director to the corporation is a fiduciary relationship because, among other reasons:

6

7

        a.     The fiduciary has scope for the exercise of some discretion or power.

8

9

        b.     The fiduciary can unilaterally exercise that power or discretion so as to affect the corporation's legal or practical interests; and

10

11

        c.     The corporation is peculiarly vulnerable or at the mercy of the fiduciary holding the discretion or power.

12

13

62.    The fiduciary duty of an officer or director to a corporation involves the obligation to refrain from improperly taking funds from the corporation.

14

15

63.    Defendant Evans breached his fiduciary duty to the Company by, among other things, fabricating the fraudulent April 17 Agreement, using it as a means of receiving the termination payment, and placing his own pecuniary interest over the Company's interest.

16

17

64.    This breach of fiduciary duty claim therefore arises out of contract, i.e., Defendant Evans' fabricating of the April 17 Agreement that he purported to be his true employment agreement, rather than the January 29 Agreement that was his true employment agreement.

18

19

20

21

65.    As a result of Defendant Evans' breach, Plaintiff Mayfair Gold was harmed by the loss of the funds improperly paid to Defendant Evans as a termination payment.

22

23

66.    As a result, Mayfair Gold has suffered damages of at least $1,525,912 CAD.

24

25

26

00339271

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## COUNT III
### *Conversion*

67.     Plaintiff Mayfair Gold re-alleges and incorporates herein the preceding allegations.

68.     Defendant Evans is in wrongful dominion or control over the funds comprising the termination payment that he received from Mayfair Gold.

69.     Defendant Evans' possession of these funds is inconsistent with Mayfair Golds' right to immediate possession of those funds.

70.     This conversion clam arises out of contract, i.e., Defendant Evans' possession of funds that he was not entitled to receive under the January 29 Agreement that was his true employment agreement.

71.     In other words:

    a.     Mayfair Gold has a possessory interest in its own funds.

    b.     Defendant Evans committed a wrongful act with respect to those funds by improperly claiming a termination payment of $1,525,912 CAD.

    c.     Defendant Evans acted intentionally in doing so.

    d.     Defendant Evans' actions had the effect and intention of interfering with Mayfair Gold's right to those funds.

    e.     Mayfair Gold suffered damages of at least $1,525,912 CAD as a result.

## COUNT IV
### *Breach of Contract*

72.     The January 29 Agreement is an enforceable contract between Defendant Evans and Plaintiff Mayfair Gold.

73.     Defendant Evans breached that contract by demanding and receiving a benefit to which he was not legitimately entitled under that contract.

00339271

74.     As a result of Defendant Evans' breach, Plaintiff Mayfair Gold suffered damages of at least $1,525,912 CAD.

75.     Defendant Evans also breached the implied covenant of good faith and fair dealing in the January 29 Agreement and the April 17 Agreement to the extent it has any validity.

76.     In every contract, there exists an implied covenant of good faith and fair dealing that prohibits one party from acting in such a way as to deprive the other party of the benefits of the bargain, or its reasonable expectations.

77.     As described more fully above, Defendant Evans' acts constitute a breach of the implied covenant of good faith and fair dealing contained in the January 29 Agreement and the April 17 Agreement to the extent it has any validity.

78.     As a result of Defendant Evans' breach, Plaintiff Mayfair Gold suffered damages of at least $1,525,912 CAD.

## DEMAND FOR TRIAL BY JURY

79.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby Requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mayfair Gold requests that this Court enter final judgment against Defendant Patrick Evans and Defendant Jane Doe Evans as follows:

a.     Awarding compensatory damages in an amount to be determined at trial, but in no event less than $1,525,912 CAD (at the present exchange rate, approximately $1.1 million USD);

b.     Awarding punitive damages;

c.     Awarding all costs, fees, and expenses incurred by Mayfair Gold;

d.     Awarding Mayfair Gold's attorneys' fees and costs pursuant to A.R.S. § 12-

00339271

1        341.01 as determined by the Court;

2      e.     Awarding pre- and post-judgment interest; and

3      f.     Awarding any other relief as the Court deems just and proper.

4      Dated this 16th day of December 2024.

*HANGLEY ARONCHICK SEGAL*
*PUDLIN & SCHILLER*

*/s/ John S. Summers*
John S. Summers
jsummers@hangley.com
A. Kyle Victor
kvictor@hangley.com
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
*Attorneys for Plaintiff*

MOYES SELLERS & HENDRICKS

*/s/ Keith L. Hendricks*
Keith L. Hendricks
*Local Counsel*
*Attorneys for Plaintiff*

00339271

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**CERTIFICATE OF SERVICE**

I hereby certify that on the 16th day of December 2024 a copy of the foregoing has been served via e-mail on all counsel or record and parties as follows:

Clerk of the Court
United States District Court
District of Arizona

*s/ Angela Schuetta*

00339271